1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERANDO VALLEY DIVISION**

FILED & ENTERED

AUG 09 2012

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gasparia DEPUTY CLERK

In re:

Steve Barlaam

Debtor(s).

Financial Services Vehicle Trust, by and through its servicer, BMW Financial Services NA, LLC

Plaintiff(s),

v.

Steve Barlaam

Defendant(s).

Case No.:  1:11-bk-13387-GM

Adv No:   1:11-ap-01402-GM

Chapter 7

**MEMORANDUM OF OPINION REGARDING PLAINTIFF AND DEFENDANT MOTIONS FOR SUMMARY JUDGMENT [DOCKET NUMBERS 22, 41, AND 44]**

Date: July 31, 2012
Time: 10:00 a.m.
Courtroom: Courtroom 303
21041 Burbank Blvd.
Woodland Hills, CA 91367

Steve Barlaam ("Defendant") moved for dismissal, which is being treated as a motion for summary judgment, and moves for summary judgment.

Plaintiff Financial Services Vehicle Trust ("Plaintiff") also moves for summary judgment. These motions will be considered together.

Plaintiff argues in its Opposition to Defendant's Revised Motion for Summary Judgment ("Revised MSJ") that the Revised MSJ is procedurally improper.  If it is a new motion, then Defendant failed to give the 42 days notice required under LBR 7056.  If it is a reply to Plaintiff's opposition to Defendant's original motion to dismiss, then it

introduced new evidence not allowed by LBR 9013-1(g)(1).  In any event, it is confusing

and lacks the required statement of uncontroverted facts and conclusions of law and the

proposed summary judgment.  Given the Defendant's pro se status, the two and half

months that elapsed between the Defendant's Revised MSJ and this hearing, and the

fact that Plaintiff has not shown any actual prejudice to it as a result of these issues, the

court will consider the Revised MSJ and evidence offered in support thereof.

**Facts**

**Rolls Royce**

Defendant had leased vehicles from Tim O'Hara, the general manager of O'Gara

Coach Co. ("O'Gara"), and periodically received solicitations to buy a Rolls Royce from

O'Gara and Rolls Royce.  Declaration of Steve Barlaam, which is Defendant's Exhibit 1

("Barlaam Dec. II") ¶¶ 1, 2; Defendant's Exhibits 21-26.

On or about 12/27/08, Dan Ruderman, went to O'Gara on behalf of Defendant to

discuss the lease of a 2009 Rolls Royce Phantom.  Declaration of Dan Ruderman

(Defendant's Exhibit 2) ¶¶ 3-6.  Mr. Ruderman watched Mr. O'Hara fill out an electronic

credit application on behalf of Defendant, which Plaintiff received on 12/27/08.

Ruderman Dec. ¶ 7; Declaration of Jason Bozarth ¶ 6; Defendant's Exhibit 5.  Mr.

Ruderman did not provide any financial information to Mr. O'Hara, who told Mr.

Ruderman he had everything he needed in his computer system.  Ruderman Dec. ¶¶ 6,

7.  Defendant was not present while Mr. O'Hara filled out the application and did not

provide any financial information.  Barlaam Dec. ¶¶ 5, 3 [sic].

Following analysis by Plaintiff's credit analysis software "Apropos" and review by two credit analysts, Plaintiff approved Defendant's lease of a 2008 Rolls Royce Phantom on or before 12/29/08.  Bozarth Dec. ¶¶ 6-14; Approval Notification, which is Defendant's Exhibit 5.   Plaintiff's approval process, which is set forth in detail in the Bozarth Declaration, used Defendant's income and employment information contained in the credit application and credit report data (which Plaintiff was able to obtain despite a typographical error in Defendant's social security number, as described below).  Bozarth Dec. ¶¶ 6-16.  Defendant has introduced four documents he received during discovery from Plaintiff that describe Plaintiff's credit approval policies.  Defendant's Exhibits 15-18 in Opposition to Plaintiff's MSJ.  These documents contain very limited direct references to income.  Id.

On 12/30/08, Defendant came to O'Gara and signed a credit application.  It is undisputed that Defendant signed a credit application.  See Declaration of Steve Barlaam dated 1/23/12 ("Barlaam Dec. I"); excerpts of 3/19/12 Deposition of Steve Barlaam, which is, in different excerpted forms, Plaintiff's Exhibit 18 in support of MSJ and Defendant's Exhibit 3 "Barlaam Deposition").   But it is not clear if he read the credit application he signed prior to signing.  See Barlaam Dec. I; Barlaam Dec. II; Barlaam Deposition.  Defendant disputes that he signed the version of the credit application admitted into evidence (the "Rolls Credit Application"), which is Plaintiff's Exhibit 5 in support of MSJ.  See Barlaam Dec. I.

The Rolls Credit Application stated that Defendant was President of "Mystic Knights Productions Inc" where he had been employed for 17 years and had "Gross Annual" of $720,000 [from employment].   The box asking whether Defendant is self employed is not checked either yes or no.  The credit application indicates that

Defendant owns his own home "free and clear" with a monthly payment of $5100.   The

credit application had a typographical error—misstating one of the first three digits of

Defendant's social security number.  Above Defendant's signature on the Rolls Credit

Application is a paragraph that begins: "The information in this application is true and

correct to the best of my knowledge."

Defendant and O'Gara also executed a Financial Services Motor Lease

Agreement (Closed End) – California (the "Rolls Lease", a redacted copy of which is

Plaintiff's Exhibit 1 in support of MSJ) on 12/30/08.  Among other things, the Rolls

Lease provided that Defendant would pay $15,000 at signing and subsequently make

48 monthly payments of 6193.26 for total payments of $306,433.22.  (The Rolls Lease's

scheduled maturity was 12/3012.)   Pursuant to the Rolls Lease, the Defendant left

O'Gara that day with a new 2009 Rolls Royce Phantom.

Shortly after the Rolls Lease was executed, O'Gara assigned it to Plaintiff, which

perfected its security interest in the Rolls.

On or about 6/1/10, Defendant stopped making monthly payments required

under the Rolls Lease.   Defendant had made 17 monthly payments prior to defaulting

under the Rolls Lease:  17 x $6193.26/monthly payment = $105,285.42 in total monthly

payments made.  Dec. of Debbie Berarducci at ¶ 17; Barlaam Dec. II ¶ 14; Defendant's

Exhibit 17.


**BMW**

On or about 4/16/10, Dan Ruderman, went to Steve Thomas BMW on behalf of

Defendant to discuss the lease of a 2011 BMW 750i.  Ruderman Dec. ¶ 12.  Mr.

Ruderman watched the Manager of Steve Thomas fill out an electronic credit

application on behalf of Defendant, which was submitted to Plaintiff on April 16.  See

Approval Notification, which is Defendant's Exhibit 6.  Mr. Ruderman did not provide any

financial information to Steve Thomas BMW, as the manager said they could use

information already in the system from Defendant's previous transactions with Plaintiff.

Ruderman Dec. ¶¶ 13, 14 .  Defendant was not present while the manager of Steve

Thomas BMW  filled out the application and did not provide any financial information.

Barlaam Dec. II ¶¶ 5, 3 [sic].

On 4/23/10, Defendant came to Steve Thomas BMW and signed a credit

Following analysis by Plaintiff's credit analysis software "Apropos" and review by

a credit analyst, Plaintiff approved Defendant's lease of a 2010 BMW 750i sedan on or

before 4/19/10.  Declaration of Donald Skeen ¶ 6; Approval Notification, which is

Defendant's Exhibit 6.   Plaintiff's approval process, which is set forth in detail in the

Skeen Declaration, used Defendant's income and employment information contained in

the credit application and credit report data (which Plaintiff was able to obtain despite

the misstatement of Defendant's birthday described below).   Skeen Dec. ¶¶ 8-13.

On 4/23/10, Defendant came to Steve Thomas BMW and signed a credit

application.   It is undisputed that Defendant signed a credit application.  See Barlaam

Dec. I  and Barlaam Deposition.   But it is not clear if he read this credit application prior

to signing.  See Barlaam Dec. I; Barlaam Dec. II; Barlaam Deposition.   And Defendant

may be disputing that he signed the BMW credit application admitted into evidence as

Plaintiff's Exhibit 7 in support of MSJ (the "BMW Credit Application"; collectively, with

the Rolls Credit Application, the "Credit Applications").  See Barlaam Dec. I.

The BMW Credit Application stated that Defendant was President of "Mystic

Knights Productions Inc" where he had been employed for 18 years, 2 months and had

"Gross Annual" of $530,000 [which is listed in the employment section].  The box asking

whether Defendant is self employed is checked no.  The credit application indicates that Defendant owns his own home with a monthly mortgage payment of $7300.  The BMW credit application had a typographical error—misstating Defendant's birthday.  Above Defendant's signature on the BMW Credit Application is a paragraph that begins: "The information in this application is true and correct to the best of my knowledge."   See Plaintiff's Exhibit 7 in support of MSJ.

Defendant and Steve Thomas BMW also executed a Financial Services Motor Lease Agreement (Closed End) – California (the "BMW  Lease", a redacted copy of which is Plaintiff's Exhibit 3 in support of MSJ) on 4/23/10.  Among other things, the BMW Lease provided that Defendant would pay $2861.36 at signing and subsequently make 36 monthly payments of $1618.00 for total payments of $59841.36.  (The BMW Lease's scheduled maturity was 4/23/13.)   Pursuant to the BMW  Lease, the Defendant left Steve Thomas BMW that day with a new 2011 BMW 750i.

Shortly after the BMW Lease was executed, Steve Thomas BMW assigned it to Plaintiff, which perfected its security interest in the BMW.

On or about 3/23/11, Defendant stopped making monthly payments required under the BMW Lease.   Defendant had made 11 monthly payments prior to defaulting under the BMW Lease: 11 x $1618/monthly payment = $17,798 total monthly payments made. Berarducci Dec. at ¶ 35; Barlaam Dec. II ¶ 14; Defendant's Exhibit 18.


**Bankruptcy Case**

Defendant filed a petition for chapter 7 relief on 3/18/11.

The Court granted relief from the automatic stay to repossess the Rolls on 5/9/11 and to repossess the BMW on 6/2/11.

The Rolls was repossessed on or about 5/5/11 and was sold on or about 6/2/11 for $246,000.  (For reference purposes, total monthly payments under the Rolls Lease were $297,276.48 and the Rolls had a post-lease residual value of $205,665.25 (see Rolls Lease, which is Plaintiff's Exhibit 1 in support of MSJ) and, as noted above, Defendant had made monthly payments totaling $105,285.42 under the Rolls Lease.)

The BMW was repossessed on or about 4/26/11 and sold on or about 6/16/11 for $79,500.  (For reference purposes, total monthly payments under the BMW Lease were $58,248 and the BMW had a post-lease residual value of $56,158.50 (see BMW Lease, which is Plaintiff's Exhibit 3 in support of MSJ) and, as noted above, Defendant had made monthly payments totaling $17,798 under the BMW Lease.)

On 6/3/11, Plaintiff filed the complaint initiating this adversary proceeding.

**Defendant's Financial Condition**

Defendant's Statement of Financial Affairs filed with the Court declares annual income from employment or operation of a business as follows:

2009   $0

2010   $13,800

2011   $0

and declares income from other sources as follows:

2009   $4

2010   $0

See Statement of Financial Affairs, which is Plaintiff's Exhibit 11 in support of MSJ.

Defendant's Schedule I states that (i) Defendant has been employed as President of Martial Arts Performances, Inc. from 1992 to the present and (ii)

Defendant's current income is $0.  See Schedule I, which is Plaintiff's Exhibit 10 in

support of MSJ.  Defendant has testified that Mystic Knight Productions was "a legal

DBA for my corporation, 'Martial Arts Performances Inc.'" Barlaam Dec. II ¶ 12

(emphasis added).  Defendant's Schedule I lists Martial Arts Performances Inc. as a

business of the debtor under item 18.

Defendant's federal income tax returns report the following amounts of adjusted

gross income:

2007   ($1,977)

2008   $8,852

2009   ($29,308), which included a $4,312 NOL Carryover

2010   ($54,312), which included a $29,312 NOL Carryover

(Defendant's reported gross income for these years is identical as no deductions were

taken.)  See Redacted Form 1040s, which are Plaintiff's Exhibits 14-17 in support of

MSJ.  Defendant's income is from his corporation Martial Arts Performances Inc.  See

Barlaam Deposition, which is Plaintiff's Exhibit 18 in support of MSJ.

Defendant stated at his 12/21/11 §341(a) meeting that he did not earn $520,000

in 2010 and he did not earn $720,000 in 2008.  He stated that he earned about

$100,000 (of income and expense reimbursement) in 2008.  See §341(a) Meeting

transcript, which is Plaintiff's Exhibit 33 in support of MSJ.

Plaintiff would not have approved the Rolls Credit Application if Defendant's

reported income on the credit application were $0 or $100,000.  Bozarth Dec. ¶ 16.

Plaintiff would not have approved the BMW Credit Application if Defendant's reported

income were $0 or negative.  Skeen Dec. ¶ 14.   In each case, if Defendant's true

income were known, Plaintiff would have concluded that there was  no income stream

to support the lease payments and would have denied the application.  Bozarth Dec.

¶16; Skeen Dec. ¶14.

**Legal Analysis**

**Elements of §523(a)(2)(B)**

The elements of 523(a)(2)(B) must be proven by a preponderance of the

evidence in order to render a debt nondischargeable. <u>Grogan v. Garner</u>, 498 U.S. 279,

291, 112 L. Ed. 2d 755, 111 S. Ct. 654 (1991).   Concluding that the subsections are

'substantially similar", the Ninth Circuit has adopted the seven-part §523(a)(2)(A) test

from  <u>Rubin v. West (In re Rubin)</u>, 875 F.2d 755, 759 (9th Cir. 1989) for 523(a)(2)(B)

cases as well:  "(1) a misrepresentation of fact by the debtor, (2) that was material, (3)

that the debtor knew at the time to be false, (4) that the debtor made with the intention

of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's

reliance was reasonable, (7) that damage proximately resulted from the representation."

<u>In re Siriani</u>, 967 F.2d 302, 304 (9th Cir. 1992); *see also* <u>Candland v. Insurance Co. of</u>

<u>N. Am. (In re Candland)</u>, 90 F.3d 1466 (9th Cir. 1996).

**Standard for Summary Judgment**

Summary judgment is proper when the pleading, discovery, and affidavits show

that there is "no genuine dispute as to any material fact and that the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which

may affect the outcome of the proceedings.  <u>Anderson v. Liberty, Inc.</u>, 477 U.S. 242,

248 (1986). The party moving for summary judgment bears the burden of identifying

those portions of the pleadings, discovery, and affidavits that demonstrate the absence

of a genuine issue of a material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986). On an issue for which the opposing party will have the burden of proof at trial,

the moving party need only point out "that there is an absence of evidence to support

the nonmoving party's case." Id. at 325.  The facts must be viewed in the light most

favorable to the party opposing the motion.  Anderson, 477 U.S. at 249; *Masson v. New

Yorker Magazine*, 501 U.S. 496, 520 (1991).  Mere allegations or denials do not defeat

a moving party's allegations.  See Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d

957, 960 (9th Cir. 1994).

        In its motion for summary judgment, Defendant argues that Plaintiff has failed to

demonstrate a triable issue of fact on all elements except element 2.  In its motion for

summary judgment, Plaintiff contends that it has established each element and no

triable issue of fact remains.  The court will consider each element required by

Candland and Siriani.

        The Court's analysis under §523(a)(2)(B) is not affected by the dealers'

assignment of both leases to Plaintiff after closing.  As the record makes clear, Plaintiff

was making the credit decisions used by the dealers in the expectation that the leases

would be immediately assigned to Plaintiff.   Barring any limitations in the assignment

itself, § 523(a)(2)(B)(iii) permits an assignee to stand in the shoes of its assignor and to

pursue an exception to discharge. Boyajian v. New Falls Corp. (In re Boyajian), 564

F.3d 1088 (9th Cir. 2009).

**Element (1):  a [written] misrepresentation of fact [respecting Defendant's financial condition]**

It is undisputed that Defendant executed both the Rolls Credit Application and the BMW Credit Application, attesting to the accuracy of the information contained therein.  It is also undisputed that both credit applications admitted into evidence contained misstatements of the Defendant's income, as well as employment history. Defendant argues that the dealers, not he, filled out the credit applications online. However, the Defendant ultimately signed the credit applications attesting the accuracy of the information contained therein.

The only remaining question of fact is Defendant's assertion that the credit applications introduced into evidence by Plaintiff are not the credit applications signed by Defendant.

**Element (2):  that was material**

> Material misrepresentations for this statutory section are substantial
> inaccuracies of the type which would generally affect a lender's or guarantor's
> decision. . . . . Certainly, in this case, significant misrepresentations of financial
> condition - of the order of several hundred thousand dollars - are of the type
> which would generally affect a lender's or guarantor's decision. The
> misrepresentations are, therefore, material.

Candland, 90 F.3d at 1470.

The misrepresentations of $100,000s of Defendant's income are precisely the type of misrepresentations cited by Candland that would affect a lender's decision to lend. They were material both (i) in the sense that the income is one of the most (if not the most) important facts in the application and (ii) in the amount of the income misstatement.  The Rolls Credit Application reported income of $720,000, but Defendant's actual income was somewhere between $0 and $100,000 for the prior

year.   The BMW Credit Application reported income of $520,000 but Defendant's actual income was somewhere between $0 and a negative number for the prior year.

Defendant makes the point that his tax return information does not include expense reimbursements.  See Barlaam Dec. II ¶ 7.  Defendant seems be suggesting that if expense reimbursements were added to the income reported on his tax returns, the total might not be materially different from the $720,000 and $520,000 on the Credit Applications.  But Defendant fails to offer any evidence that adding expense reimbursements to his income would bring the total close to the figures represented on the Credit Applications.  This "mere allegation" by the Defendant is insufficient to defeat Plaintiff's evidence that Defendant's income was materially misstated.

Misstatement of Defendant's employment history may also be material.    Plaintiff makes much of the discrepancy in corporate names:  Defendant used a d/b/a instead of the legal name of his wholly-owned corporation.  More troubling, however, is Defendant's failure to disclose that he is self-employed in the Rolls Credit Application and his statement that he is not self employed in the BMW Credit Application, which significantly changes the meaning of his working for the same company for 17 or 18 years.

**Element (3): that the Defendant knew at the time to be false**

It is not clear from Defendant's declarations and deposition testimony whether Defendant read the credit applications prior to signing.  In any event, Defendant either the read the credit applications in which his income was misstated by over half a million dollars (or put another way, by more than 500%) -- which he had to have known was

untrue—or Defendant failed to read the credit applications, with a recklessness that also

meets the standard for this element.

> "[T]he Debtor cannot simply sign a document that purports to describe his own
> financial condition without reading it or questioning anyone as to its contents
> and then be held blameless if the statement contains materially false
> information.  A creditor need not establish that the debtor had actual knowledge
> of the falsity of the representation in order to prevail under section 523(a)(2).
> He may satisfy this element of the required showing by proving that the false
> statement "was either knowingly made or made with sufficient recklessness so
> as to be fraudulent."

Merchants Bank of Cal. v. Oh (In re Oh), 278 B.R. 844, 858 (Bankr. C.D. Cal.

2002)(quoting Alside Supply Center v. Aste (In re Aste), 129 B.R. 1012, 1017 (Bankr. D.

Utah 1991)).  The Oh defendant's recklessness in signing financial statements without

reading them satisfied this element.  And Defendant in this case does not even have

Oh's excuse of failing to speak English.

        Defendant maintains that the Credit Applications were ambiguous and different

from the standard credit application Defendant was familiar with from many previous

automobile leases.  Defendant argues that it is reasonable to conclude that the box

labeled "Gross Annual" would include a company's gross revenue.  Barlaam Dec. II ¶¶

5, 6. He cites First Mutual Sales Fin. v. Cacciatori (In re Cacciatori), Adv. Case No.

10:ap-01699-MW (Feb. 12, 2012), which held that the defendant did not know her

representations of income on a credit application were untrue, because of the credit

application form's confusing nature.  Among other things, it was not clear what "income

metrics" the self-employed defendant should have used for "Applicant's Gross Income".

        Defendant's belief that "Gross Annual" would include his company's gross

revenue is patently unreasonable:  the box was located in the "employment" section.

Defendant's contention that he had signed numerous credit applications that all sought

his income undercuts his argument.  Gross revenues (i.e. revenues before deducting

expenses) are irrelevant to a borrower's ability to make loan payments.  Defendant, not

his company, was the party to these leases and Defendant failed to disclose he was

self-employed in the Credit Applications, so he had no reason to believe the revenues of

his company mattered to the Lessor.  Most importantly, unlike the defendant in

Cacciatori Defendant has failed to introduce evidence that his company's revenues

were close to the figures in the Credit Applications.  Mere allegations cannot defeat

Plaintiff's factual showing.


**Element (4): that the Defendant intended to deceive the Plaintiff**

Courts look at the totality of the circumstances, including a "reckless disregard for

the truth", to determine whether defendant had intent to deceive.  See, e.g., Gertsch v.

Johnson & Johnson Fin. Corp. (In re Gertsch), 237 B.R. 160, 167-68 (B.A.P. 9th Cir.

1999); Highline Capital Corp. v. Register (In re Register), 2010 WL 605314 (Bank. W.D.

Wash. Feb. 19, 2010).

In Kavoussi v. Johnson & Johnson Fin. Corp. (In re Kavoussi), 60 Fed. Appx.

125, 127 (9th Cir. Cal. 2003)(citing Tustin Thrift & Loan Ass'n v. Maldonado (In re

Maldonado), 228 B.R. 735, 738 (B.A.P. 9th Cir. 1999), the court inferred intent, noting

that "[i]t is impossible to believe that Dr. Kavoussi's notation that he owned '100%

shares' of his corporations was intended to indicate anything other than that he owned

100% of each corporation" and his "failure to reveal to JJFC that all of his assets were

pledged to his parents was not mitigated by a reasonable explanation demonstrating

good faith."  Like Kavoussi, Debtor's intent to misrepresent his income can be inferred

from the totality of the circumstances, especially his recklessness in signing the credit

application (as discussed in the preceding section).  Such reckless disregard alone can

establish intent to deceive.  See Cacciatori, 465 B.R. at 555; Oh, 278 B.R. at 858-60.

**Element (5):  upon which Plaintiff relied**

In its declarations from two credit analysts, Plaintiff has introduced evidence that

it relied on the statements of income and employment in the Credit Applications in

deciding whether to approve the proposed leases.  On the other hand, Defendant has

introduced material produced by Plaintiff that describe its credit approval policies.

These materials are abbreviated and will require testimony to fully understand, but they

contain very few direct references to income.   Accordingly, Defendant and Plaintiff have

each produced sufficient evidence to make reliance a triable issue of fact.

Defendant argues repeatedly that Plaintiff's credit approval was issued before

Defendant ever signed the Credit Applications: therefore Plaintiff did not rely on

Defendant's signing the Credit Applications.  Defendant's argument is factually correct

on timing, but ultimately irrelevant to reliance.  It is beyond dispute that if Defendant had

pointed out the misstatement of his income or refused to sign the credit applications at

closing, he would not have left either dealership with a new car.

**Element (6):  Plaintiff's reliance was reasonable**

The Ninth Circuit has not set a bright-line test for reasonableness. *See* Heritage

Pac. Fin., 2012 Bankr. LEXIS 1383 (quoting Candland, 90 F.3d at 1471). One lower

court has stated that "[t]he emerging standard of reasonableness requires the court to

measure creditor's actual conduct in the case at bar against three different factors: the

creditor's standard practices in evaluating creditworthiness; the standards or customs of

the creditor's industry in evaluating creditworthiness; and the surrounding circumstances

existing at the time of the debtor's application for credit." In re Masegian, 134 B.R. 402,

408 (Bankr. E.D. Cal. 1991) (quoting In re Harms, 53 B.R. 134, 141 (Bankr. D. Minn.

1985)).

Plaintiff's papers detail its credit approval process at some length.  From the

credit analysis software program used by Plaintiff to the two-person review required for

a lease with the dollar amount of the Rolls Lease to the 4 C's of credit analysis, Plaintiff

describes a very reasonable process.  And defendant has not raised any questions

about the reasonableness of Plaintiff's credit analysis process.  The issue is whether it

was reasonable to rely on the information that Plaintiff input into that process.

Plaintiff has clearly established that Defendant's income was grossly misstated,

and his employment status was misstated, in both credit applications.   Defendant

argues that Plaintiff never verified the information in the Credit Applications.  Was it

reasonable for Plaintiff to rely solely on Defendant's statements of income and

employment without performing independent inquiry?  Yes, as reasonableness does not

require independent investigation of defendant's representations:

> The fact that MBC, if it so desired, might have performed a more thorough
> investigation or might have independently attempted to verify some or all of the
> information contained on the Financial Statement, and did not do so, does not
> give rise to a defense:  "Lenders do not have to hire detectives before relying
> on borrowers'      financial statements . . . ." Gertsch v. Johnson & Johnson
> Fin. Corp. (In re Gertsch), 237 B.R. 160, 170 (B.A.P. 9th Cir. 1999). "A person
> is justified in relying on a representation of fact although he might have
> ascertained the falsity of the representation had he made an investigation."
> Field v. Mans, 516 U.S. 59, 116 S. Ct. 437, 444, 133 L. Ed. 2d 351 (1995). Or,
> as the Ninth Circuit put it in In re Lansford, 822 F.2d 902, 904 (9th Cir. 1987),
> "Having intentionally misled the sellers in an area he knew was important to
> them, it is unseemly for Lansford now to argue that he should be excused from
> section 523 because the sellers believed him."

Oh, 278 B.R. at 858; see also Candland, 90 F.3d 1466.

The credit applications were filled online by the dealerships without input from

Defendant.  (Neither party has introduced evidence indicating where the credit

information used by the dealerships came from.)   Is this process, which appears to be

common in Plaintiff's operations, reasonable?  Furthermore, the credit applications

themselves contain enough errors to raise questions about the care and knowledge with

which they were filled out. The Rolls Credit Application indicates that Defendant owns

his home free and clear, but also has a $5100 monthly mortgage payment.  Both have

errors, one in social security number and one in birthdate that affect identity for credit

reports.  (Defendant also argues that the ambiguity in the meaning of "Gross Annual"

raises issue on the reasonableness of relying on any information filled in that box.)

Whether these irregularities in process and errors in the statements themselves would

cause a reasonable person to question the data is triable issue of fact.   As the Ninth

Circuit noted in upholding a bankruptcy court decision on the issue:

> The bankruptcy court acknowledged that the question of whether Northwestern's
> reliance was reasonable was a close one. It noted first that the financial
> statements appeared to be complete and "very professional." Northwestern
> checked out a few references to determine the accuracy of the statements; the
> bankruptcy court found this was "reasonable inquiry." There were several factors
> suggesting reliance was unreasonable:  Northwestern did not ask for financial
> statements when it initially issued the bond; the financial statements did not
> include contingent liabilities, such as the very liability created by the original
> bond; Northwestern made no inquiry into guaranties. The bankruptcy court found,
> nonetheless, "that the factors in favor of reasonable reliance are much stronger
> than those that suggest that reliance was not reasonable. The defendant simply
> cannot rely on minor clues of falsity in a financial statement that on the whole has
> all the appearance of being very complete and reliable and where the plaintiff
> takes reasonable steps to inquire as to the creditworthiness of the defendants.. ."

Siriani, 967 F.2d at 307.

**Element (7):  Damage to Plaintiff proximately resulted from Defendant's**

**misrepresentation**

Plaintiff has established proximate causation with evidence that its credit policies are such that, had Defendant not misrepresented his income and employment, Plaintiff's would not have extended credit to Defendant and would not have suffered the damages from Defendant's breach of the leases.   The amount of those damages has not been clearly demonstrated by Plaintiff, however.

Plaintiff has set out its calculation of damages for each lease in the declaration of Debbie Berarducci, which also refers to and uses numbers from Plaintiff's Exhibits 19 and 25.   The Court has briefly reviewed these calculations with reference to the leases; while they appear facially correct, it is difficult and time-consuming to trace all the numbers to their sources.  The Court asks the Plaintiff to prepare a single calculation of damages for each lease, containing all relevant line items (with a reference to their source in the lease, for items like residual value, or in other documents or testimony, for items like number of lease payments made).  The Court can then readily understand the calculation of damages and Defendant can raise specific objections to any item.

## Conclusion

Plaintiff has introduced sufficient evidence of each element of §523(a)(2)(B) to survive Defendants' motion for summary judgment.  Defendant's motion for summary judgment is denied.

In fact, Plaintiff has established elements (2) materiality, (3) Defendant's knowledge of falsity, (4) Defendant's intent to deceive and (7) any damages to Plaintiff under the Leases proximately resulted from the misrepresentation, beyond any issue of material fact.  Plaintiff is granted partial summary adjudication on these issues

These issues of material fact remain to be determined at trial:  1) Did Defendant actually make the misrepresentation of fact, specifically did he sign the Credit Applications in evidence,  (5) whether Plaintiff relied on the misrepresentation, (6) was Plaintiff's reliance reasonable, and (7) what was the amount, if any, of damages to Plaintiff resulting from the misrepresentation.  The remainder of Plaintiff's motion for summary judgment is denied.

**Plaintiff's Evidentiary Objections**

(Plaintiff submitted evidentiary objections with respect to both its MSJ and Defendant's MSJ.  Since the declarations of Steve Barlaam and Dan Ruderman submitted with respect to each MSJ are identical, Plaintiff's evidentiary objections to these declarations are identical for each MSJ.  The court's ruling applies to both sets of objections.)

**Declaration of Steve Barlaam**

Objection 1: overruled to the extent not offered to prove truth of the matter asserted

Objection 2:  overruled on hearsay to the extent not offered to prove truth of the matter asserted; sustained as to foundation

Objection 3:  overruled on first sentence; sustained on second and third sentences

Objection 4:  overruled

Objection 5:  overruled

Objection 6:  overruled on the second sentence, sustained on the first and third sentences

Objection 7:  overruled

Objection 8:  overruled

Objection 9: sustained

Objection 10:  overruled on the first sentence and sustained on the second sentence

Objection 11: sustained

Objection 12: sustained

Objection 13:  sustained except for second sentence

Objection 14: sustained except for number of payments made

Objection 15: sustained

Objection 16: overruled except for second sentence

Objection 17:  sustained except for what information Plaintiff did or did not request from

Defendant

Objection 18:  sustained

Objection 19: sustained


**Declaration of Dan Ruderman**

Objection 1: sustained

Objections 2-9:  overruled to the extent not offered to prove the truth of the matter

asserted.  (This evidence may also be admissible to prove truth of the matter asserted if

the dealerships were agents of Plaintiff, but the court is not relying on this evidence in

its ruling and so will give further consideration to this issue at this time.)

**Declaration of Holly Roark**

Objections 1-3: overruled

     A pretrial conference is scheduled for September 25, 2012 at 10:00 a.m. in

Courtroom 303, 21041 Burbank Blvd., Woodland Hills, California 91367.

###

DATED: August 9, 2012

United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): _ **MEMORANDUM OF OPINION REGARDING PLAINTIFF AND DEFENDANT MOTIONS FOR SUMMARY JUDGMENT [DOCKET NUMBERS 22, 41, AND 44]** _____
was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner stated below:

**1.    SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of (*date*)_____, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

Rebecca Caley Email: rcaley@caleylaw.com
David Gottlieb Email: dkgtrustee@crowehorwath.com

☐  Service information continued on attached page

**2.    SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

Steve Barlaam
19107 Marlia Court
Tarzana, CA 91356-5813

☐  Service information continued on attached page

**3.    TO BE SERVED BY THE LODGING PARTY:** Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐  Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9021-1.1.NOTICE.ENTERED.ORDER**