1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANOD VALLEY DIVISION**

FILED & ENTERED

JUL 31 2013

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

In re:

Steve Barlaam

Debtor(s).

_____

 Financial Services Vehicle Trust, by and
through its servicer, BMW Financial
Services NA, LLC

Plaintiff(s).

    v.

Steve Barlaam

Defendant(s).

_____

Case No.:  1:11-bk-13387-GM

Adv No:   1:11-ap-01402-GM

Chapter 7

**MEMORANDUM OF OPINION REGARDING
JUDGMENT FOR PLAINTIFF AFTER TRIAL**

Date: July 8 and July 9, 2013
Time: 9:00 a.m.
Courtroom: 303

## I. INTRODUCTION

        This litigation revolves around the potential dischargeability of debts incurred by

Steve Barlaam ("Barlaam" or "Defendant") in connection with two car lease agreements,

both entered into with BMW Financial Services ("Plaintiff" or "BMW FS").  Specifically,

the leases at issue concern a 2009 Rolls Royce Phantom Sapphire (the "Rolls Royce"

or "Sapphire") and a 2010 BMW 750i Sedan (the "BMW").  On 03/18/11, Defendant filed

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

a petition for Chapter 7 relief and on 06/03/11, Plaintiff filed a §523(a)(2)(B)[1] complaint

to determine the dischargeability of the debt owed to it by Defendant in connection with

these two leases.

On 08/09/12 this Court ruled on several elements of §523(a)(2)(B) in response to

dueling motions for summary judgment.[2]  The Court found that of the seven required

elements, the Plaintiff successfully established all or part of the following:  (2)

materiality, (3) Defendant's knowledge of falsity, (4) Defendant's intent to deceive and

(7) any damages to Plaintiff under the Leases proximately resulted from the

misrepresentation.  Partial summary adjudication was granted in the Plaintiff's favor on

these issues.

The issues reserved for trial and decided herein are as follows:  (1) did

Defendant actually make the misrepresentations of fact, specifically did he sign the

Credit Applications in evidence; (5) did Plaintiff rely on the misrepresentations; (6) was

Plaintiff's reliance reasonable; and (7) what was the amount, if any, of damages to

Plaintiff resulting from the misrepresentations.


## II. FINDINGS OF FACT

As stated above, based on the evidence presented as part of the motions for

summary judgment, this Court found that certain facts were "undisputed" and used

those "undisputed" facts to make its ruling and grant partial adjudication.  However as is

so often the case – particularly where the Defendant was representing himself during

the motion for summary judgment – further evidence was presented at trial that may

have impacted the Court's prior specific factual findings.  But that decision is final.  And,

---

[1] All references are to 11 U.S.C. unless otherwise noted.
[2] 1:11-ap-01402-GM, Doc #70, 71, 72.

in this case, the Court would have reached the same result even if there had been no

motion for summary judgment.


As a background to the transactions described below, the Court finds that

Barlaam is a lover of high-end cars, often leasing two or more of them at the same time.

Between 2004 and 2010 he financed (for purchase or lease is not clear)[3] some nine

high-end cars and, exclusive of the two involved in this case, he has paid for all of the

others in full and/or according to their terms [FTR 07/09/13, 1:15 p.m.].[4]

Defendant's personal assistant Dan Ruderman ("Ruderman") has known

Barlaam for sixteen years and is very knowledgeable about cars.  When Barlaam

decided to obtain a new car, he would instruct Ruderman on the kind of car that he

wanted and then Ruderman would locate the car and the dealership and would

negotiate the deal.  It is undisputed that on all of the other cars that he has leased

during the years prior to the two cars in question in this case, Ruderman would take the

credit application from the dealer to Barlaam, who would complete it and have

Ruderman return it to the dealer.  In general Barlaam would not have personal contact

with the dealer or visit the dealership except to sign the papers and then take delivery of

the car.

It is Barlaam's assertion that this pattern changed on these two cars in that he

did not receive or complete a credit application, but first saw and then signed these

without review at the time that he went to each dealership to take delivery.

---

[3] It is not clear, nor is it important, whether the prior cars were obtained through purchase or through lease.  So, for purposes of this opinion, the Court will use those terms interchangeably except in reference to the two cars at issue in this adversary proceeding, both of which were leased.
[4] References to FTR date and time are to the court's recording system at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   A.  The Rolls Royce.

   Prior to leasing the Rolls Royce in question, Defendant had leased three vehicles

from Tim O'Hara ("O'Hara"), the general manager of O'Gara Coach Co. ("O'Gara"),

including a 2005 Rolls Royce Phantom, which was paid off in 2007.  In late 2008

Barlaam received an email from O'Hara about a Rolls Royce Phantom, but he did not

want this – Barlaam wanted something special.  So O'Hara located one Rolls Royce

Phantom Sapphire in Southern California.  This is a special edition automobile and

costs considerably more than a regular Rolls Royce Phantom [Exhibit 503, 504].[5]

   Apparently O'Hara's search was initiated after Ruderman dropped in to the

dealership before 12/26/08, since Ruderman testified that he had an earlier face-to-face

conversation with O'Hara at the dealership and then he went back on 12/26/08 to get

the sticker and the basic rough lease figures for the car.  After Ruderman presented

these to Barlaam, Barlaam asked Ruderman to go back to the dealer and see if he

could make a deal, which included trading in the Ferrari that he currently leased.  So on

12/27/08, Ruderman went to O'Gara on behalf of Defendant to discuss the lease of the

2009 Rolls Royce Phantom Sapphire and a deal was made.

   On 12/27/08, a credit application was electronically submitted by the O'Gara

dealership to BMW Financial Services and at 6:34 that evening it was entered into the

BMW FS APPRO computer system [Exhibit 3, p. 10].  The major dispute concerning the

Sapphire is who provided the information that BMW FS received in its APPRO system

and who provided the information that was on the written and signed credit application

[Exhibit 1].  Because of the inconsistency in Ruderman's testimony, this is discussed

below.

---

[5] Unless otherwise stated, all exhibit numbers refer to exhibits admitted at trial.

1
2
3
4
5
6
7

The information electronically input by the dealer (presumably by O'Hara, but it may have been another employee of O'Gara) had several mistakes, including Barlaam's social security number. However the application sufficiently identified Barlaam since APPRO identified him as a prior customer and noted that there was a variance between the social security number in the application and that which was known to BMW FS [Exhibit 3, p. 10].

8
9
10
11

O'Hara had the Sapphire moved from a dealer in Rancho Mirage to the O'Gara dealership and on 12/28/08 Barlaam, Ruderman, and Barlaam's ex-girlfriend met O'Hara at the dealership so that Barlaam could inspect the car.

12
13
14
15

Late in the afternoon of 12/29/08, after two credit analysts at BMW FS had reviewed the credit bureau report [Exhibit 2] and clarified certain information on the credit application (such as verifying the correct social security number), BMW FS notified the O'Gara dealership that it approved Barlaam for the lease [Exhibit 3, 4].

16
17
18
19
20
21
22
23
24
25
26

On 12/30/08, Barlaam came to the O'Gara dealership and signed the lease and other required documents, including the credit application, though Barlaam claims not to have read the application before signing it [Exhibit 1]. Above Defendant's signature on the Rolls Royce Credit Application is a paragraph that begins: "The information in this application is true and correct to the best of my knowledge." However, the credit application contained several errors: an incorrect social security number and phone number, a monthly mortgage payment of $5,100 although it also states that Barlaam owned his home "free and clear," and an incorrect indication of gross income at $720,000.[6]

27
28

---

[6] In his testimony on 7/8/13, Barlaam does not admit that the $720,000 figure was incorrect, but said that he is not sure what "gross income" meant and that he does not know what his actual income was at that time. [FTR 07/07/13, 10:33 a.m.] However, in its ruling on the Motion for Summary Judgment, the Court found that the

At the same time that he signed the credit application, Barlaam also executed a

Financial Services Motor Lease Agreement (Closed End) – California (the "Rolls Royce

Lease.") [Exhibit 10].  Among other things, the Rolls Royce Lease provided that

Defendant would pay $15,000 at signing and subsequently make 48 monthly payments

of $6,193.26 for total payments of $306,433.22.  The Rolls Royce Lease's scheduled

maturity was 12/30/12.  Once the paperwork was signed, possession of the Sapphire

was turned over to Barlaam.  O'Gara then assigned the Lease to Plaintiff.[7]

After making seventeen payments (all in a timely fashion), Defendant defaulted

with the payment due on 06/01/10 [Exhibit 18].  He voluntarily turned the car in and it

was sold by BMW FS in a dealer auction on 06/02/11 for $246,000 [Exhibits 24, 27,

28].[8]

B.  The BMW.

Barlaam did not use the Sapphire for his everyday driving, but kept it for special

occasions, pleasure driving, and/or to impress clients.  Prior to spring 2010, Barlaam

was in several car accidents and his "everyday" Ferrari did not give him the proper

headrest support, so he test drove a 750 BMW, which was more comfortable.  He had

never had a BMW before and had no relationship with a BMW dealer.  So once again

Ruderman was requested to locate a car and negotiate a deal.

On or about 04/16/10, Ruderman went to Steve Thomas BMW in Camarillo and

decided that this was the dealership to work with.  On 4/19/10 Ruderman and Willie, the

---

$720,000 was a material misrepresentation and that the only remaining issue is whether he actually made the misrepresentation by signing the Credit Applications.  At trial Barlaam offered no new evidence as to income.

[7] The Court is not sure whether title to the Rolls Royce and to the BMW was in BMW FS, Barlaam, or some other entity.  However there is no doubt that BMW FS had the right to repossess and sell on default.

[8] It is unclear when the Rolls Royce was turned in since the default occurred in June 2010, the bankruptcy was filed the following March and the car still had not been sold.  The motion for relief from stay was granted, without opposition, at the hearing on 5/4/11 and the invoice for pick-up uses the date 5/5/11 [Exhibit 24].

manager of Steve Thomas BMW, negotiated the lease terms and Ruderman called Barlaam, who agreed to them.

According to Ruderman, Ruderman gave Barlaam's name to Willie and Willie told Ruderman that Barlaam was a previous client [presumably of BMW FS] and that Willie was able to locate Barlaam's file in the computer system. Ruderman testified that he did not give Willie any financial information on Barlaam and that Willie told him that none was needed since he could and did look up Barlaam in the computer system, found him, and that he was "solid gold." [FTR 07/09/2013, 4:23].

Steve Thomas BMW submitted the credit application to BMW FS on the afternoon of 4/16/10. Following analysis by APPRO (Plaintiff's credit analysis software) and review by a credit analyst, Plaintiff approved Defendant's lease of the 2010 BMW 750i sedan on 4/19/10 [Exhibits 14, 15].

On 04/23/10, Barlaam came to Steve Thomas BMW and signed a credit application, though Barlaam claims not to have read the application prior to signing it.

The BMW Credit Application stated that Defendant was President of "Mystic Knights Productions Inc" where he had been employed for 18 years, 2 months and had "Gross Annual" of $530,000 [Exhibit 12]. The box asking whether Defendant is self-employed is checked "no." The credit application indicates that Defendant owns his own home with a monthly mortgage payment of $7,300. The BMW credit application misstated Defendant's birthday. Above Defendant's signature on the BMW Credit Application is a paragraph that begins: "The information in this application is true and correct to the best of my knowledge."

At that same time, Barlaam signed the Financial Services Motor Lease Agreement (Closed End) – California (the "BMW Lease.") [Exhibit 16]. Among other

things, the BMW Lease provided that Defendant would pay $2,861.36 at signing and

subsequently make 36 monthly payments of $1,618.00 for total payments of

$59,841.36.  The BMW Lease's scheduled maturity was 04/23/13.  Possession of the

BMW was then given to Barlaam.

Shortly after the BMW Lease was executed, Steve Thomas BMW assigned it to

Plaintiff, which perfected its security interest in the BMW.[9]

After making eleven timely lease payments, Defendant defaulted with the

payment due in March 2011 [Exhibit 30].  On 4/26/11 he voluntarily turned in the BMW

and on 6/16/11 it was sold at a dealer auction for $79,500 [Exhibits 35, 38, 39].

C. Ruderman's Credibility

The Court has previously found that the amount of gross income stated on each

of the two credit applications was a material misrepresentation of fact.[10]  In determining

whether Barlaam is liable for the misleading financial data on the credit applications, the

first place to start is with the testimony of Ruderman, who was responsible for the

negotiation of both leases and who was the person who met with O'Hara and with Willie

when the initial applications were being transmitted to BMW FS.

Ruderman testified that the particular transactions for these two cars were

markedly different from the previous four or five that he had engaged in for Barlaam and

the forty to fifty that he had done for friends and family over the years [FTR 07/09/2013,

4:02 p.m.].  According to Ruderman, the main difference between these transactions

and the previous ones is that in every other transaction the dealerships (including

O'Gara) had always required that the person seeking to lease or purchase the car

---

[9] See footnote 7.
[10] 1:11-ap-01402-GM, dkt. 70

(including Barlaam) fill out a credit application before the dealership went forward to seek approved credit [FTR 07/09/13, 4:02 p.m.; 4:33 p.m.].  However Ruderman testified that during these two transactions neither dealership required that Barlaam -- or Ruderman on Barlaam's behalf -- provide any financial information.

As to the Rolls Royce transaction, Ruderman testified that he was not asked to provide any identifying or financial information about Barlaam [FTR 07/09/13, 4:14 p.m.].  Ruderman stated that "Tim put the information into his computer on his own and said basically 'I'll take care of this and I'll get you an approval within a couple of hours.'" [FTR 07/09/2013, 4:19 p.m.].   A few hours later, Tim called to let Ruderman know that the credit application had been approved [FTR 07/09/13, 4:21 p.m.].

The Court has not information on whether the financial data input by O'Gara was identical to that of the prior application.  And in any case, the prior lease occurred some two years earlier and the O'Gara would certainly have required an update.

Similarly concerning the BMW transaction, Ruderman testified that the only information he provided to the dealership manager was Barlaam's name.  The manager requested no other information.  After the manager used the name to look Barlaam up in the computer system, he told Ruderman that everything regarding the credit application process was sure to be "solid gold."  [FTR 07/09/2013, 4:23 p.m.]. Ruderman also testified that at that time Willie (the credit manager at Steve Thomas BMW) stated that the system showed that Barlaam already had a Rolls Royce lease [FTR 07/09/13, 4:35 p.m.].  Ruderman testified that nothing else was required and Willie indicated that he (the manager) would submit the credit application electronically [FTR 07/09/2013, 4:25 p.m.].  Ruderman does not claim to have been present for the actual submission of the application.

This description appears to be in conflict with his earlier declaration in which Ruderman states that "I was personally present when the managers at both dealerships simply completed his credit application for him electronically without him being there."[11] However, as to the BMW, he testified at the trial that he was present and could see the screen well enough to determine that the BMW application form was open; that Willie told him he would submit the application electronically with the information that existed in the system; and that he could not see what Willie actually was inputting in order to ascertain that Barlaam had solid gold credit and a Rolls Royce. He also inferred that Willie would be submitting the electronic credit application at a later time [FTR 07/09/13, 4:19 p.m.; 4:25 p.m., 4:38 p.m.].

The major credibility issue arises concerning Ruderman's testimony that Willie became aware of Barlaam's credit and leasing history without any input from Ruderman or Barlaam. This was the first BMW that Barlaam had ever leased/purchased and it was his first transaction with Steve Thomas BMW or with the manager of that dealership. In order for Ruderman's testimony to be credible, when Willie started to input the credit application, he would have had to receive immediate computer access to Barlaam's prior transactions with BMW FS.[12]

The testimony of Kenneth Ciolli, the National Credit Manager for BMW FS, shows that this assertion was impossible. Ciolli testified that BMW dealerships and BMW FS utilize different computer systems. A dealership enters a client's information on a computer screen into a form in the Info Bahn system. This is extracted by APPRO, which is the BMS FS software, and then the BMW FS credit analyst processes it in

---

[11] 1:11-ap-01402-GM, Declaration of Don Ruderman in Support of Notice of Motion and Motion to Dismiss for Failure to Prove Reasonable Reliance, Doc #6, ¶4.
[12] Ruderman's testimony was that Willie put in Barlaam's name and immediately commented that Barlaam had a Rolls Royce and solid gold credit [FTR 07/09/13 4:23; 4:35].

APPRO [FTR 07/08/2013, 11:29 – 11:30 a.m.].  There is no evidence that the information can travel in more than one direction on these systems – namely from BMW FS to the dealer.  Thus there is no way that Willie – who had no prior dealings with Barlaam – could have obtained prior financial data (or any data) about Barlaam from BMW FS in the manner described by Ruderman.

Ruderman's testimony also lacks credibility because even if Willie could somehow have tracked down the BMW FS information on Barlaam, he would have found that it was 18 months out of date and surely would have requested that it be confirmed by Barlaam.   Also, had Willie seen the BMW FS information and the prior financial information and decided to use it, he would have input a gross income of $720,000, since there was no reason for him to reduce it to $530,000 [Exhibits 1, 12].  In fact, there is no reasonable explanation as to why Willie or O'Hara would have fabricated Barlaam's financial data since it is likely that this could have put them and their dealerships at risk.

The Court simply does not find Ruderman to be a credible witness as to these facts.  Neither dealer was called to testify, so there is no evidence to support Ruderman's account.  Beyond that, there is no reason that the dealerships would deviate from their usual procedure and not send Barlaam a financial application to complete.  While Ruderman suggests that O'Hara was so desperate for a sale that he might have made up the information for the credit application, this makes no sense since - based on his past transactions with Barlaam - O'Hara had every reason to believe that Barlaam could qualify.

D. Barlaam's Credibility

Barlaam claims that he did not read or even see the information on the credit applications, although he admits that he personally signed them.  First he stated that he never actually saw the Rolls Royce application, but merely signed a blank sheet with a date typed in [FTR 07/08/13 10:30 a.m.].  Because of his relationship with that dealer, he felt comfortable signing the various documents without any review [FTR 07/08/13, 10:36 a.m. – 10:38 a.m.].  At his deposition, he had stated that he remembered reviewing some document(s) before signing, but at trial he testified that he didn't even realize that he was signing a credit application for the Rolls Royce because he was preapproved and the general manager had applied for him [FTR 07/08/13, 10:42 a.m.,10:38 a.m.].

He asserts that for the Rolls Royce he was handed the one page credit application - turned to the back side - and that he signed it without any review.  But he also admitted that he was told what it was before he signed it [FTR 07/08/13, 10:36 a.m.; 07/09/13, 1:46 p.m.].  He emphasized that he fully trusted O'Gara because of his previous relationship with that dealership [FTR 07/09/12, 1:47-1:48 p.m.].  While he testified that because the Rolls Royce application had so many errors that he would have corrected them if he had seen them, he also said that in the case of both leases, "I glanced over to see what I was signing, but I did not review every single word."  [FTR 07/08/13, 10:31 a.m.; 10:48 a.m.]

The next day he testified that he must have been told that he was signing a credit application.  And although he was under no pressure, he felt that it was not worthwhile to read everything before he signed, which would have taken five hours.  This is because he chooses the best dealership that he trusts [FTR 07/09/13, 3:18 pm.].

So Barlaam has testified that he (1) wasn't told what he was signing, (2)was told what he was signing, (3) didn't turn the credit application over so he never saw the information on it, and (4) glanced over to see what he was signing, but didn't review every word.

As to the BMW, he also stated that he never saw the application; that he was given a big stack of paper to sign and did not see what was on the other side; that the stack of documents had "sign here" stickers; and that the general manager would identify each document before he signed them.  But there was no pressure to sign and he was handed each document, one at a time [FTR 07/08/13, 10:44 a.m.; 07/09/13, 1:53 p.m.; 07/09/13, 3:25 p.m.].

Barlaam testified as to both cars that he never discussed giving financial information because he was preapproved [FTR 07/08/13, 10:41 a.m.; 10:28 a.m.; 10:38 a.m.; FTR 07/09/13, 3:20 p.m.].  However, on July 9 he contradicted himself when he said that "they said they had all the information that was needed.  That is what they told Danny [Ruderman] and myself."  [FTR 07/09/13, 3:24 p.m.].  So there was some sort of a discussion about the financial information.

The Court has a very hard time finding that Barlaam is credible.  If his transaction with O'Gara alone had included him signing everything without at least quickly reviewing them, it is possible that he would be believable because there was a prior history upon which to build trust.  However, he had no such relationship with the Steve Thomas dealership or its personnel and this leaches out the basis to make his story credible.  It is simply unbelievable that Barlaam would fail to look through a one page lease agreement and a one page credit application before signing onto a nearly $100,000 transaction with a party with whom he had no history.

And there are more inconsistencies.  While Barlaam repetitively asserts that he did not even turn the credit application over, he also stated that he scanned the documents before signing them.  Each credit application is only a single page, no small print, and includes just a few numbers.  Because he scanned it, he could not possibly have missed the errors that he now points out.  The Court finds that, in fact, Barlaam – directly or through Ruderman – intentionally gave the erroneous income information to the dealers, hoping to have them relied on by BMW FS, but did it in such a way that it could not be traced back to him.  Had he pointed out the typographical errors, a new application would have had to be made and he might have had to verify that everything else was correct.  This was what he was avoiding.

It should also be noted that at the time that he leased the BMW he had every reason not to reveal his true financial status.  He had Steve Thomas BMW proceed with the deal on 04/16/10.  After that date he only made one more payment on the Rolls Royce before he defaulted.[13]  The reason that he gives for the default was that his girlfriend lost a huge modeling contract in May or June 2010 and could not pay her portion of the mortgage for July.  This caused him an immediate inability to make the payments since he had to cover the whole mortgage payment [FTR 07/09/13, 2:32 p.m.].

The bankruptcy schedules filed on 03/18/11 show that the Debtor was tenant in common with Yvette Rachelle on the property located at 19107 Marlia Court, Tarzana.  The monthly payment was $7,119.82.[14]  It is inconceivable that BMW FS would have granted this credit if it had known that Barlaam's income was so tenuous that he would

---

[13] This makes the timing of the BMW transaction suspect because there can be little or no doubt that BMW FS would not have approved a new lease if Barlaam was already in default on the Rolls Royce.
[14] The motion for relief from stay by Bank of America confirms that this is the total monthly payment and not merely a one-half share.  1:11-bk-13387-GM, dkt. 10.

default merely because his co-tenant could not contribute $3.500+ per month toward the home mortgage.

Thus, while Steve Thomas BMW had no compelling reason to create a financial statement for Barlaam, Barlaam had every reason to do so and this Court finds that he did.  Because Barlaam lacks credibility on his testimony as to the BMW, the Court cannot accept at face value his testimony concerning O'Gara.  This shifts the burden to him to provide other credible evidence in support of his defense, which he has not done.

## III. CONCLUSIONS OF LAW

As previously stated, this Court has already ruled on certain elements of the §523(a)(2)(B) motion.  The following analysis is reserved only for those elements which were left to be decided after trial.

### A. Burden of Proof

Plaintiff bears the burden of proof to establish the required elements of §523(a)(2)(B) by a preponderance of the evidence.[15]

### B. Barlaam Made a Written Misrepresentation of Fact Concerning His Financial Condition].

Section 523(a)(2)(B) requires that the credit be obtained by a statement in writing that is materially false.  The Court has already ruled that the representation of income on both credit applications was materially false.  The only remaining issue is whether Barlaam made or authorized those representations.  On the motions for summary

---

[15] See  Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); Zhong v. Yong Li (In re Yong Li), 2012 Bankr. LEXIS 5264 (B.A.P. 9th Cir. Nov. 7, 2012).

judgment, the Court limited this to the question of whether Barlaam signed the credit applications, which is now admitted.  But the evidence at trial goes further than that to show that Barlaam or his agent is the likely original source of the false information.

But even if the dealers were the ones who created the inaccurate financial data in the Info Bahn System, the Court finds that Barlaam was aware of the falsity of his income as filled out on the credit applications he signed before delivery of the cars was made.  The Court finds that he reviewed the credit applications and knew of the inaccuracies and accepted those as true statements through the act of signing them.

Barlaam tried to convince the Court that he did not read or see the front of the credit applications and did not even know that he was signing a credit application. However the inconsistencies in his testimony, as described above, make this into an incredible and unbelievable assertion.

In any event, the effect is the same whether Barlaam or Ruderman physically wrote in a false gross annual income, whether it was the fault of an agent of the dealership, and whether or not Barlaam read the documents before he signed them. The Ninth Circuit has continually held a party liable for documents signed by that party, whether or not the party read them.  A party cannot "escape liability under 523(a)(2)(B) by firmly putting his head in the sand and later claiming not to have known of the falsity of representations that were made on his behalf while his head was covered."[16]

Barlaam either made these misrepresentations, had them made on his behalf through Ruderman, or at the very least buried his head in the sand when he failed to verify the accuracy of the information before signing the documents.

---

[16] Merchant's Bank of California v. Oh (In re Oh) 278 B.R. 844, 858 (9th Cir. 2002).

1

2    C. <u>Plaintiff Relied on the Misrepresentations</u>

3        Defendant argues that BMW Financial Services did not rely on the gross annual

4    income stated on the credit applications, but rather a host of other factors, including

5    Barlaam's history with BMW FS and his impeccable credit.  Defendant's Counsel

6    focused on pointing to various training documents prepared by BMW FS and given to

7    BMW FS's credit analysts as guidelines for making a credit decision.  The Court is not

8    convinced that the documents' lack of the word "income" should indicate that income

9    was not a consideration of BMW FS credit analysts when making their decision

10   regarding Barlaam.

11       While it is clear that the income is only one of several metrics used in making the

12   credit decision, it is an important one.  Ciolli testified that making this decision is not an

13   "exact science" and that numerous considerations are taken into account in the process

14   of approval or denial [FTR 07/08/13, 2:32 p.m.].  The first thing that a credit analyst sees

15   on the APPRO screen (the "big picture" screen) includes an applicant's stated income

16   [FTR 07/08/13, 11:30 a.m.].  Based on this income, the APPRO system makes various

17   calculations, amongst them a debt to income ratio and a payment to income ratio.

18   These calculations, as well as the income itself, are in fact the first things considered by

19   a credit analyst in making a credit decision.  If these numbers are below that which is

20   preferred, the credit application is denied at that point [FTR 07/08/13, 11:35 a.m.].  Had

21   Barlaam set forth the income stated on his bankruptcy schedules, this would have

22   triggered an automatic denial of his application [FTR 07/08/13, 2:00 p.m.].

23       The Court accepts Ciolli's testimony and finds that it is supported by a review of

24   the documents.  While a credit analyst may also consider an applicant's history with the

25   company, employment information, and credit history, first it is necessary for the

26

27

28

numbers on the big picture screen to meet BMW FS standards.  Barlaam's long history

with the company and unblemished credit would only served to bolster what the

numbers on the big picture screen already indicated – namely, that Barlaam was a

worthy loan applicant.  Thus, it's clear that Plaintiff relied on Defendant's

misrepresentation for had the income been stated correctly, the credit application would

have been denied.

      Another argument put forth by the Defendant is that the credit applications were

approved before Barlaam even signed the leases.  As the argument goes, this would

make it impossible for BMW Financial Services to have relied on the information on the

credit applications that he signed, since they had already approved the leases.

      The Court does not find this to be a meaningful defense.  It is clear that the

applications were approved on a contingency basis, that contingency being the

accuracy of the information that had already been provided to BMW FS.  Barlaam's

signature served as verification of the accuracy of that information.  The agreements

themselves make this clear.  Just above Mr. Barlaam's signature on both credit

applications, a paragraph reads: "The information in this application is true and correct

to the best of my knowledge."  [Exhibits 1, 12].  Verifying the information was a

prerequisite to taking possession of the cars.  Had Barlaam made changes to the

information on the credit applications, the dealership managers would have needed to

contact BMW FS before completing the transaction.

      It is clear from Ciolli's testimony that Barlaam's loan would have been denied had

the income stated on his credit application matched that on his bankruptcy schedules

[FTR 07/08/2013, 2:00 p.m.].  As this Court pointed out in its Memorandum of Opinion

on Summary Adjudication, "if Defendant had pointed out the misstatement of his income

or refused to sign the credit applications at closing, he would not have left either dealership with a new car."[17]

BMW FS did rely on the information provided on the credit applications and only authorized the dealerships to hand over the keys to the car once Barlaam had signed the required documents.  Thus, Plaintiff has successfully established that it relied on Barlaam's misrepresentation.


D.   Plaintiff's Reliance Was Reasonable.

There is no bright line test for reasonableness.[18]  One lower court has stated that "[t]he emerging standard of reasonableness requires the court to measure creditor's actual conduct in the case at bar against three different factors: the creditor's standard practices in evaluating creditworthiness; the standards or customs of the creditor's industry in evaluating creditworthiness; and the surrounding circumstances existing at the time of the debtor's application for credit."[19]

This Court has already found that the process by which BMW FS makes its credit decisions is reasonable and that to rely on Defendant's statements without further independent inquiry is also reasonable.[20]  The remaining issue is whether it was reasonable for BMW Financial Services to rely on the input information given the number of errors in the credit applications.   As stated in the Defendant's papers, and as discussed at length during trial, there were no fewer than 9 errors between the two

---

[17] 1:11-ap-01402-GM, Doc #70, pg. 15
[18] See Heritage Pac. Fin., 2012 Bankr. LEXIS 1383 (quoting Candland, 90 F.3d at 1471).
[19] In re Masegian, 134 B.R. 402, 408 (Bankr. E.D. Cal. 1991) (quoting In re Harms, 53 B.R. 134, 141 (Bankr. D. Minn. 1985)).
[20] 1:11-ap-01402, Doc #70, pg. 16

applications.[21]

 In spite of these errors, it was reasonable for Plaintiff to have relied on the information in the credit applications.  With the exception of the misstated income, which is really at the heart of this case and will be discussed subsequent to the more minor errors, all the errors could be considered by BMW FS to have been typographical.  They were not significant or numerous enough to discredit the reliability of the applications as a whole.

The two errors regarding digit variances in Barlaam's social security number and phone number are common errors with only slight repercussions.  Human errors such as these are frequent and thus have remedial processes outlined in BMW FS's Training Manual [Exhibit 53].  Ciolli also detailed the process by which a digit variance is corrected.  The success of this remedial process was tested in this very case when Barlaam's credit application for the BMW was originally denied due to a digit variance in his birth date [Exhibit 14-2].  Defendant's suggestion that this error had any bearing on the application's reliability is moot because the error was corrected before BMW FS approved the loan.

The remaining errors are less trivial, but nonetheless fail to render the credit applications unreliable.  The Ninth Circuit has ruled that "factors in favor of reasonable reliance are much stronger than those that suggest that reliance was not reasonable. The defendant simply cannot rely on minor clues of falsity in a financial statement that on the whole has all the appearance of being very complete and reliable…"[22]  That the "self-employed" box was left unchecked and that it was not indicated on the application that Barlaam was a previous BMW FS customer are insignificant errors that ultimately

---

[21] 1:11-ap-01402-GM, Doc #123, pgs. 9-10
[22] In re Siriani, 967 F.2d 302, 307 (9th Cir. 1992).

had little bearing on the reliability of the application.  Both factors were only relevant

after the income was found to be sufficient.  These errors indicate little more than minor

oversight, someone simply forgetting to check a box.  Nor were they determinative of

the credit application's approval.  The same is true of the errors regarding Barlaam's

home: the misstatement that he owned it "free & clear" and that the mortgage was

$5,100.  None of these factors were even considered by credit analysts until the big

picture screen indicated that Barlaam met BMW FS's minimum standards for loan

approval.  These "minor clues of falsity" do not render the applications unreliable on the

whole.

        As found above, the misstated income was not a mere typographical error or

oversight.  It was intended that BMW FS would rely on the figures stated - and that is

exactly what BMW FS did.  Nor was Plaintiff unreasonable is assuming that the factual

statements on the applications were correct, as "lenders do not have to hire detectives

before relying on borrowers' financial statements," according to Ninth Circuit

precedent.[23]  Whether the misstated income was the result of human error or blatant

misrepresentation, it was reasonable that the Plaintiff relied on it in making its credit

decisions.  That there were minor errors elsewhere in the application is ultimately

inconsequential.


        E.  <u>The Amount of Damages to Plaintiff Resulting from the Misrepresentation.</u>

        Throughout the case, Defendant has questioned the legitimacy of the sale of the

Rolls Royce, but the Court is convinced that the $246,000.00 for which it sold reflects

the car's fair market value at the time of sale.  The testimony of Jimmie Rea, a vehicle

---

[23] <u>See</u> <u>Oh</u>, 271 B.R.at 858.

analyst who has been employed by BMW FS for 17 years, speaks to this issue.  On the day of the Rolls Royce sale, there were no fewer than 1,650 dealers physically present at the auction.  An additional 950 dealers were registered online for the sale [FTR 07/08/2013, 9:40 a.m.].  The average sale of a car in these auction proceedings lasts about 60 seconds.  This particular sale took 2 and a half minutes [FTR 07/08/2013, 9:41 a.m.].  Rea himself was present at the sale and testified that BMW FS likes to take its time selling Rolls Royce vehicles so as to maximize the value of the cars [FTR 07/08/2013, 9:42 a.m.].  Though the auction listed the car as a 2009 Rolls Royce Phantom, thereby failing to acknowledge the special features of the Sapphire deluxe edition, this information was available to all bidders [Exhibit 29].

Prior to the auction, floor bidders were able to physically inspect the car, which had on it the sticker containing all the specific information about the car.  This same sticker was made available to online bidders about a week prior to the auction [FTR 07/08/2013, 10:18 a.m.].  All of the above demonstrates that the car was marketed and sold properly, and that the amount for which it sold reflects its fair market value.

Based on the documentation and on Rea's testimony, the Court also finds that the BMW was marketed and sold so that the amount for which it sold reflects its fair market value.

In its August 9 Memorandum of Opinion, this Court asked that the Plaintiff prepare a single calculation of damages for each lease.[24]  Plaintiff provided these documents as attached Exhibits 2 and 3 to its trial brief and as Plaintiff's Trial Exhibits 42 and 44.[25]  The testimony of Jacob Martin, a team leader for the fraud and

---

[24] 1:11-ap-01402-GM, Doc #70, pg. 18
[25] Id., Doc #125, pgs. 23-24

repossession department at BMW FS, explains these calculations in detail.[26]  The Court is satisfied with the explanation of each calculation, however was surprised to find that the math on both transactions appears to be wrong.  The proper calculation is set forth on the attached Calculation of Damages.  For the Rolls Royce, BMW FS never included the $30 storage charge, which is documented on Exhibits 18-2 and 25.  Therefore this will not be included in the damages.

The Court finds that the correct amount of damages for the Rolls Royce totals $111,817.95.

For the BMW transaction, as set forth on the attached Calculation of Damages, the Court finds the damages total $6,652.90 rather than the $6,712.50 listed on the Account Balance.[27]

Thus, the damages incurred by Plaintiff through both leases totals $118,470.85.


F.  Attorney's Fees

Plaintiff is seeking to recover its attorney's fees in this nondischargeability action. A recent 9th Circuit Bankruptcy Appellate Panel decision clearly sets forth the rather complicated precedent governing an award of attorneys' fees in a §523(a)(2) action:

> Under the principle known as the "American Rule," prevailing parties in federal court are not ordinarily entitled to attorney's fees unless authorized by contract or by statute. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975). The Bankruptcy Code does not provide a general right to recover attorney's fees. Heritage Ford v. Baroff (In re Baroff), 105 F.3d 439, 441 (9th Cir. 1997).
> The Supreme Court has addressed the precise issue of whether a prevailing creditor can recover attorney's fees in a Section 523(a)(2) action. In Cohen v. de la Cruz, 523 U.S. 213, 118 S. Ct. 1212, 140 L. Ed. 2d 341 (1998), the Court held that a debt incurred by fraud can include costs and attorney's fees. "Once it has been established that specific money or property has been obtained by fraud, . . .

---

[26] Mr. Martin's testimony took place on 07/08/13 and begins at 3:07 p.m.

[27] See Plaintiff's Trial Exhibit 44 for a detailed accounting.  At trial Mr. Martin acknowledged that he had erred in his calculations and that the correct total of these figures should have been listed as $6,712.50.

'any debt' arising therefrom is excepted from discharge." Id. at 218.

A prevailing creditor's right to attorney's fees is not absolute, however. We have interpreted Cohen such that "the determinative question for awarding attorney's fees is whether the creditor would be able to recover the fee outside of bankruptcy under state or federal law." AT & T Universal Card Servs., Corp. v. Hung Tan Pham (In re Hung Tan Pham), 250 B.R. 93, 99 (B.A.P. 9th Cir. 2000). Put more precisely, the question is "whether [the] creditor would be entitled to fees in state court for 'establishing those elements of the claim which the bankruptcy court finds support a conclusion of nondischargeability.'" In re Dinan, 448 B.R. at 785 (quoting Kilborn v. Haun (In re Haun), 396 B.R. 522, 528 (Bankr. D. Idaho 2008)).

Because the basis for attorney's fees can be statutory or contractual, id. at 786, and there is no express statutory basis for attorney's fees, our analysis centers on the attorney's fee provision in the Settlement Agreement as construed under non-bankruptcy law (as there is no such provision in either of the promissory notes). If the scope of the attorney's fee provision is broad enough to encompass a state court action that has the same elements as a Section 523(a)(2)(A) claim — common law fraud — then Salcido is entitled to attorney's fees. [citation omitted][28]

The leases in this case contain identical attorney's fee provisions providing that if Barlaam is in default under the lease, the Plaintiff is entitled, among other things, to require Barlaam to pay "all fees and costs of collection, including reasonable attorneys' fees, court costs, interest, and other related expenses for all losses you incur in connection with my default of this Lease."[29]

In determining whether this provision covers attorney's fees in an action for fraud, the Court applies California law, because ¶40 of each lease makes the lease subject to the laws of the state where the lease was signed.  Again, Sharma is instructive:

California statute expressly allows parties to contract as they see fit concerning the payment of attorney's fees. "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys is left to the agreement, express or implied, of the parties[.]" Cal. Code Civ. Prov. § 1021 (West 2012). The type of claim — tort, contract, or otherwise — is irrelevant under the statute. Miske v. Bisno, 139 Cal. Rptr. 3d 626, 634, 204 Cal. App. 4th 1249, 1259 (2012); see Redwood Theaters, Inc. v. Davison (In re Davison), 289

---

[28] Sharma v. Salcido (In re Sharma), 2013 Bankr. LEXIS 2286, 50-51 (B.A.P. 9th Cir. May 14, 2013); see also Saccheri v. St. Lawrence, Valley Dairy (In re Saccheri), 2012 Bankr. LEXIS 5140, 38 (B.A.P. 9th Cir. Nov. 1, 2012).

[29] Rolls Royce Lease [Exhibit 10] ¶26(second "e")(5); BMW Lease [Exhibit 16] ¶26(second "e")(5).

B.R. 716, 724 (B.A.P. 9th Cir. 2003). The sole issue is whether the contractual provision itself covers tort claims for fraud. *See* <u>Miske</u>, 139 Cal. Rptr. 3d at 634. The California courts have repeatedly interpreted clauses that authorize attorney's fees to "enforce" or "interpret" a contract to not include tort claims for fraud. <u>Exxess Electronixx v. Heger Realty Corp.</u>, 75 Cal. Rptr. 2d 376, 383-84, 64 Cal. App. 4th 698, 707-08 (1998); *see* <u>Xuereb v. Marcus & Millichap, Inc.</u>, 5 Cal. Rptr. 2d 154, 157, 3 Cal. App. 4th 1338, 1341-42 (1992). On the other hand, California courts have held that certain broadly-worded clauses do cover fraud claims. <u>Santisas v. Goodin</u>, 951 P.2d 399, 405, 17 Cal. 4th 599, 608, 71 Cal. Rptr. 2d 830 (1998) ("claims arising out of the execution of the agreement or the sale" (internal quotation marks omitted) (emphasis added)); <u>Miske</u>, 139 Cal. Rptr. 3d at 628-29 ("If any dispute arises between the Partners . . . prevailing party shall be entitled to . . . reasonable attorney's fees." (emphasis added)); <u>Lerner v. Ward</u>, 16 Cal. Rptr. 2d 486, 488, 13 Cal. App. 4th 155, 159 (1993) ("in any action or proceeding arising out of this agreement" (internal quotation marks omitted) (emphasis added)); <u>Xuereb</u>, 5 Cal. Rptr. 2d at 157 ("attorney fees and costs in any lawsuit or other legal proceeding to which this Agreement gives rise" (internal quotation marks omitted) (emphasis added)).

<u>Xuereb</u> stated that "gives rise" even includes events that occurred prior to contract formation. 5 Cal. Rptr. 2d at 157. But even the phrase "any dispute" is not determinative, as a clause limiting fees to "any dispute under this agreement" does not cover fraud claims because "under this agreement" limits the claims to those that arise directly out of the contract and not those that rely on events that occurred before contract formation. See Thompson v. Miller, 4 Cal. Rptr. 3d 905, 911, 112 Cal. App. 4th 327, 334 (2003).[30]

The BAP ultimately determined that an action to "enforce or interpret any part of this agreement" was not broad enough to encompass a claim for fraud in the inducement.[31]

The attorney's fees provisions in both the Rolls Royce Lease and the BMW Lease are included under "all fees and costs of collection."   Like enforcement in <u>Sharma</u>, collection under the contract is simply not broad enough to cover fraud in the inducement.  That the attorney's fees clause ends with "and all other related expenses for all losses you incur in connection with my default of this Lease" similarly indicates that attorney's fees are limited to enforcement actions and do not extend to fraud.

Plaintiff's request for attorney's fees is denied.

---

[30] <u>Sharma</u>, 2013 Bankr. Lexis 2286 at 54.

[31] <u>Id.</u>, <u>See also</u> <u>Saccheri</u>, 2012 Bankr. LEXIS 5140, 39-40 ("the attorneys' fees clause was in an agreement that was not even in existence at the time the acts which led to nondischargeability occurred").

1

2    IV. **CONCLUSIONS**

3
     Having at this point considered the entire record, the Court finds that Plaintiff has
4
5    successfully established each element of its §523(a)(2)(B) action by a preponderance of

6    the evidence.  The debts owed to Plaintiff by Defendant are nondischargable.

7    The damages owed to Plaintiff by Defendant total $118,470.85, a detailed

8    accounting of which is explained above.

9    Because the leases do not support the award of attorneys' fees on an action

10   under §523(a)(2)(B), Plaintiff's request for attorneys' fees for the present litigation is

11
     denied.  As prevailing party, Plaintiff is entitled to its costs under Fed.R.Bank.Proc.
12
13   7054(d)(1) and is to file a Bill of Costs in conformance with Local Bankruptcy Rule 7054-

14   1.

15   The complaint does not request prejudgment interest although the Plaintiff's trial

16
     brief requests the sums due under the lease "plus accrued interest, attorneys' fees and
17
     court costs."[32]  Prejudgment interest is a part of the Plaintiff's damages and helps to
18
     make the Plaintiff whole.[33]  Where the debt in question arose under state law, the issue
19
20   of whether prejudgment interest can be awarded is governed by state law.[34]

21   Prejudgment interest is allowed in California under Cal. Civ. Code §3287, which

22   states:

23
         (a) Every person who is entitled to recover damages certain, or capable of being
24       made certain by calculation, and the right to recover which is vested in him upon
         a particular day, is entitled also to recover interest thereon from that day, except
25       during such time as the debtor is prevented by law, or by the act of the creditor
         from paying the debt. This section is applicable to recovery of damages and
26       interest from any such debtor, including the state or any county, city, city and

27
     _____
28   [32] 1:11-ap-01402-GM, dkt. 125, p. 9.
     [33] In re Stoecker, 5 F.3d 1022 , 1026 (7th Cir. 1993).
     [34] Otto v. Niles (In re Niles), 106 F.3d 1456, 1463 (9th Cir. 1997).

county, municipal corporation, public district, public agency, or any political subdivision of the state.

(b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed.

Prejudgment interest can be allowed on a case for damages due to fraud so long as it meets the criteria of ascertainability.[35]

In this case, the amount due under the leases was ascertained upon the sale of the two vehicles.  Thus, it is appropriate for prejudgment interest to run from that date to the date of entry of judgment.  Because they were sold on different dates, though only two weeks apart, for ease of calculation interest will run from the later sale date of 6/16/11.

The actual interest rate to be used by a federal court is a matter of some contention and is to be determined on a case-by-case basis, particularly if it exceeds the federal judgment interest rate, which is generally lower than the state judgment interest rate.  Although there is a justification for using the agreed-to contract rate of interest, the criteria that the Court is to apply is to make the Plaintiff whole, rather than give it a windfall.  In this case, given the low cost to borrow money since the sale, I will use the federal judgment interest rate rather than the much higher 10 percent California rate.[36]  Thus prejudgment interest will be calculated from 06/16/11 to the date of entry of judgment at the rate of 0.18%.

---

[35] Cal. Civ. Code §3288; Smith v. Rickards, 149 Cal.App.2d 648 (Ct. of App. 1957).
[36] The Lease provides for post-default interest at "a rate not exceeding the highest lawful rate."  [Exhibit 10, 16, ¶26(e).]

1    Judgment will be entered for the amount of $118,924.22 [$118,470.85 plus

2    $453.37 in prejudgment interest], plus costs.

3    ###

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Date: July 31, 2013

_____
Geraldine Mund
United States Bankruptcy Judge

25

26

27

28

| ROLLS ROYCE DAMAGES | Exhibit 42 | | Addition to Ex. 42 | Comments |
|---|---|---|---|---|
| | | | | end of 10 days to request an appraisal |
| Quote good through date: 5-16-2011 | | | | |
| Scheduled payments: | | | | |
|    Monthly payment amount | 5,721.26 | | | Ex. 10, p. 2 |
|    Monthly payment outstanding | 31.00 | | | Ex. 18 - 17 were made |
| Total remaining payments | 177,359.06 | | | |
| Residual value per contract | 205,665.25 | | | Ex. 10-1 |
| Unearned rent charge | (29,527.78) | | | unrealized depreciation and interest - Ex. 41 |
| late fees | 2,860.60 | | | Ex. 18 |
| **Total payoff amount per lease** | | **356,357.13** | | as of 5-28-12 |
| | | | | |
| Repossession and Auction Expenses and Charges: | | | | |
|    Repo fees | 525.00 | | | Ex. 24 = $275+$250 |
|    Collection fees | 425.00 | | | Ex. 23 - investigation fee |
|    Reconditioning Fee(s) | 150.00 | | | Ex. 21, 22 |
|    Auction Fee(s) | 115.00 | | | Ex. 21 |
|    Transportation | 160.60 | | | Ex. 21, 26 |
|    Trans Assistance | 65.22 | | | Ex. 21 |
|    Promotional Fee(s) | 10.00 | | | Ex. 21 |
|    DMV Fee(s) | 10.00 | | | Ex. 21 |
|    *Storage charge* | | | *30.00* | *included in Ex. 42* |
| **Total Repossession and Auction Expenses and Charges** | | **1,460.82** | ***$1,490.82*** | |
| | | | | |
| **Total Obligation to BMW FS on Rolls Royce** | | **357,817.95** | ***$357,847.95*** | |
| | | | | |
| **Gross auction proceeds from sale** | | **(246,000.00)** | **($246,000.00)** | Ex. 28-1 |
| | | | | |
| **Balance owing on Rolls Royce** | | **111,817.95** | ***$111,847.95*** | |

| BMW DAMAGES | Exhibit 44 | | | |
|---|---|---|---|---|
| Quote good through date: 4-27-2011 | | | | |
| Scheduled payments: | | | | |
|   Monthly payment amount | 1,474.26 | | | Ex. 16-2 |
|   Monthly payment outstanding | 25 | | | Ex. 30 |
| Total remaining payments | 36,856.50 | | | |
| Residual value per contract | 56,158.50 | | | Ex. 16-1 |
| Unearned rent charge | (7,927.46) | | | Ex. 43 |
| late fees | 73.71 | | | **Ex. 30** |
| **Total payoff amount per lease** | | 85,161.25 | | |
| | | | | |
| Repossession and Auction Expenses and Charges: | | | | |
|   Repo fees | 275.00 | | | Ex. 35 |
|   Reconditioning Fee(s) | 100.00 | | | Ex. 33 |
|   Auction Fee(s) | 115.00 | | | |
|   Transportation | 85.60 | | | Ex. 37 |
|   Trans Assistance | 59.05 | | | Ex. 33 |
|   Promotional Fee(s) | 10.00 | | | Ex. 33 |
|   DMV Fee(s) | 10.00 | | | Ex. 33 |
|   Body repair | 287.00 | | | Ex. 33 |
|   *Storage charge* | 50.00 | | | Ex. 36 |
| **Total Repossession and Auction Expenses and Charges** | | 991.65 | | |
| | | | | |
| **Total Obligation to BMW FS on BMW** | | 86,152.90 | | |
| | | | | |
| **Gross auction proceeds from sale** | | (79,500.00) | | Ex. 39 |
| | | | | |
| **Balance owing on BMW** | | 6,652.90 | | |

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): __ **MEMORANDUM OF OPINION REGARDING JUDGMENT FOR PLAINTIFF AFTER TRIAL** _____
was entered on the date indicated as AEntered@ on the first page of this judgment or order and will be served in the manner stated below:

**1.   SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** Β Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of (*date*)_____, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below:

- Christopher P Ayayo     chris@ayayolaw.com, debbie@ayayolaw.com;alo.bankruptcy@gmail.com;tkennedy@ayayolaw.com
- Rebecca A Caley     rcaley@caleylaw.com
- David Keith Gottlieb (TR)     dkgtrustee@crowehorwath.com, dgottlieb@ecf.epiqsystems.com,renee.johnson@crowehorwath.com
- Tina M Starr     tstarr@caleylaw.com
- United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov

☐   Service information continued on attached page

**2.   SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

BMW Financial Services
P.O. Box 3608
Dublin, OH 43016-0306

Steve Barlaam
19107 Marlia Court
Tarzana, CA 91356-5813

☐   Service information continued on attached page

**3.   TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an AEntered@ stamp, the party lodging the judgment or order will serve a complete copy bearing an AEntered@ stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                              **F 9021-1.1.NOTICE.ENTERED.ORDER**

☐    Service information continued on attached
page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9021-1.1.NOTICE.ENTERED.ORDER**